T.C. Memo. 1998-354

UNITED STATES TAX COURT

SANDY KAY JONES AND CLINT JOSEPH JONES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 116-97.                    Filed October 5, 1998.

Sandy Kay Jones and Clint Joseph Jones, pro sese.

<u>Jeremy L. McPherson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined a deficiency in, and a
penalty on, the Federal income tax for 1994 of Sandy Kay Jones
(Mrs. Jones) and Clint Joseph Jones (petitioner) as follows:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|------|------------|------------------------------------------|
| 1994 | $45,673 | $13,543 |

All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.  All dollar amounts are rounded to the nearest dollar, unless otherwise indicated.

After concessions by the parties,[1] the issues for decision are:  (1)  Whether the amounts reported by petitioners as royalties are gross receipts from petitioners' trade or business.  We hold they are.  (2)  Whether the net profit from petitioners' trade or business is subject to self-employment tax.  We hold it is.

                                    FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulated facts and accompanying exhibits are incorporated into our findings by this reference.  At the time the petition in

_____

[1]  In the notice of deficiency, respondent disallowed for lack of substantiation deductions for the cost of goods sold and several expenses of petitioners' business, including returns and allowances, commissions expense, and additional Schedule C expenses.  Respondent concedes that petitioners paid the expenses disallowed in the notice of deficiency.  Respondent further concedes that petitioners are not liable for the accuracy-related penalty under sec. 6662(a).
    The parties agree that if this Court decides that the reported royalties are income subject to self-employment tax, then petitioner's 1994 self-employment tax liability is $10,632, and petitioners are liable for a deficiency in that year of $9,026.
    In light of these concessions, and the parties' agreement, a Rule 155 computation is necessary.

this case was filed, petitioners resided in Placerville, California.

Petitioner is a self-employed salesman and distributor for several multilevel marketing companies (companies) and has been engaged continuously in this activity since 1982. Petitioner has sold products for many companies, including Omnitrition International, Inc., Herbalife, Biometrics, Nutrition Express, Matol, New Vision, and TMI International. Mrs. Jones has not been involved with petitioner's sales or distributor activities since 1982.

The companies petitioner is involved with all have a similar multilevel marketing system (the system). Under the system, petitioner finds customers for a company's products and then recruits customers who are enthusiastic about the products as distributors. To become a distributor, the customer completes an application, which petitioner supplies, and mails it to the company. On the application form, petitioner's name is entered as the sponsor or "up-line distributor" for the applicant. The distributors recruited by petitioner may repeat the process of finding customers and recruiting them as distributors. The distributors recruited by petitioner are considered first-level distributors. The distributors recruited by the first-level distributors are, with reference to petitioner, second-level

distributors.  These lower level distributors are collectively referred to as petitioner's down-line distributors.

Petitioner sells products directly to his customers at the regular retail price, and he sells products to his distributors at a discounted price.  Petitioner is paid a commission on the sales he makes directly to his customers, and he is paid a commission, called a "royalty" by the companies,[2] on the sales made by his first-level distributors.  Once a distributor sells a certain dollar value of products, the distributor becomes a "breakaway distributor".  The breakaway distributor buys products directly from the company, rather than from petitioner.  Although the breakaway distributor is no longer under the supervision of petitioner and no longer purchases the company's products through petitioner, petitioner receives royalty payments from the company on the purchases made by the breakaway distributor.

Petitioner's first-level distributor, who recruits a second-level distributor, receives a royalty for all of the sales by that second-level distributor.  Petitioner also receives a royalty for each sale by the second-level distributor.  The number of distributor levels below petitioner for which he

---

[2]  The companies refer to these payments as "royalties".  We use this word in describing the payments for convenience without accepting this categorization in a legal context.  Yoakum v. Commissioner, 82 T.C. 128, 140 (1984) (the language used may indicate the form of the payment but does not control the character).

receives royalty payments depends upon the particular company. For instance, New Vision pays royalties for six levels of down-line distributors, and Herbalife pays royalties for three levels.

Petitioner receives substantially more income from royalty payments than he does from his direct sales. In the year at issue, petitioner reported a loss on the direct sales, due to the costs of promoting his business. Promoting his business included developing distributors who would break away and generate royalty income for him.

For the year at issue, petitioner reported the receipts from his direct sales, $23,464, on Form 1040 Schedule C, Profit or Loss From Business, as gross receipts from sales, and claimed $72,027 as business expenses. Petitioner reported the royalty income he received, $190,485, on Form 1040 Schedule E, Supplemental Income and Loss, and claimed $7,438 as commissions expenses.

OPINION

Respondent determined that the income petitioner received from the companies on the sales made by his down-line distributors is income from petitioner's trade or business and is subject to self-employment tax under section 1401. Petitioners assert that the royalty income is not earned income nor income from petitioner's trade or business and is therefore not subject to self-employment tax. Respondent's determination is presumed

correct, and petitioners bear the burden of proving that respondent's determination is erroneous.  Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

<u>Issue 1.  Whether the Amounts Reported by Petitioners as Royalties Are Gross Receipts From Petitioner's Trade or Business</u>

The instant case is almost identical factually to <u>Abraham v. Commissioner</u>, T.C. Memo. 1988-412.  In holding that the payments[3] to the taxpayer in <u>Abraham</u> for sales made by his down-line distributors were self-employment income, this Court focused on the activities the taxpayer performed in his business.  We found that the taxpayer, realizing that his income was dependent upon the sales activities of his distributors, devoted substantial time and energy to training and developing these individuals. All of the taxpayer's activities, which included providing the distributors with motivation and encouragement, imparting to them his skills, knowledge, and experience with the products, and counseling them on selecting successful recruits, were conducted in an attempt to increase the productivity of the distributors at all levels.  Therefore, the fact that the taxpayer had no personal contact with the down-line distributors at the second and lower levels made no difference; he devoted his time with the

---

[3]  In <u>Abraham v. Commissioner</u>, T.C. Memo. 1988-412, the multilevel-marketing companies used the terms "bonus" or "commission payments" to describe the commissions they paid the taxpayer for the sales made by his down-line distributors.

expectation that well-trained first-level distributors would develop successful second-level distributors, who in turn were likely to develop third-level distributors.

Petitioner argues that the facts of Abraham v. Commissioner, supra, are different from the facts of the instant case. Petitioner testified that the multilevel-marketing industry has undergone a big transition since we decided Abraham v. Commissioner, supra. According to petitioner, the training and motivation of distributors is now done by the companies with video and conference calls. Petitioner, however, called no witnesses nor produced any other evidence to corroborate his testimony. We cannot assume the testimony of absent witnesses would have been favorable to petitioner. Rather, the normal inference is that it would have been unfavorable. Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Furthermore, we find that petitioner's own testimony does not support his argument that this case is distinguishable from Abraham v. Commissioner, supra.

Petitioner testified that in the year at issue he sustained a loss on his own efforts to sell the companies' products, but that he did so "with a view of developing distributors who will break away and * * * generate more income * * * in a royalty."

Petitioner spent a great amount of time, effort, and money on developing customers into distributors. For example, petitioner spent $3,274 in placing newspaper advertisements, and printing and distributing flyers to find new customers for the companies' products. Practically every day, petitioner took people to lunch or dinner so they would become his friends, because "people tend to buy from their friends."[4] Petitioner held meetings in his home and hotel rooms for customers, and distributors who were not yet breakaway distributors, to share product result stories and introduce the people to the products, which he often provided as samples at no cost. At every opportunity, petitioner would propose to enthusiastic customers that they become distributors. If enthusiastic customers agreed to become distributors, petitioner provided them with application forms on which he was designated as the sponsor or up-line distributor.

Petitioner has been regularly and continuously engaged in selling products for multilevel marketing companies since 1982. All of the multilevel marketing systems with which petitioner is involved include a royalty payment structure. Furthermore, petitioner is involved in this business with the primary purpose

---

[4] Petitioner reported that he spent $6,882 on meals and entertainment in 1994. He took the deduction for this expense on Form 1040 Schedule C, Profit or Loss From Business.

of making a profit.[5]  However, it is clear from petitioners' return, and petitioner's testimony, that without the royalty payments, petitioner had no honest objective of making a profit from this activity.  Thus, we conclude that recruiting and developing distributors is an integral part of petitioner's business.  See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

Petitioner also argues that as he has hundreds of down-line distributors who he has never met and who sell products over a broad geographical area, the sales made by his breakaway distributors are earned income to the companies, not to him. With respect to the payments from the lower-level distributors, we can see no distinguishable difference between this case and

---

[5]  At trial, petitioner gave the following testimony in response to respondent's questions:

Q.    And your primary purpose was for income or profit from the whole--the whole operation; your sales and the down-line distributor sales?  That was your motive?

A.    Well, it's a little bit leading, there, Counselor, but basically--

Q.    I'm entitled to lead.

A.    Are you?  We can lead around here, huh?

The Court: On cross-examination, you can lead.

A.    Okay.  Allright.  But, yeah, well, obviously, you know, my real motivation in life is to help people but to make a profit as I do it is not against my principles.

Abraham v. Commissioner, T.C. Memo. 1988-412, despite petitioner's arguments to the contrary. Petitioner devoted his time and effort to increasing the productivity of the distributors at all levels; it was his expectation that well-trained first-level distributors would develop successful lower level distributors who were likely to generate commission income for him.

During the year under consideration petitioner regularly and continuously engaged in selling the companies' products, and especially, recruiting distributors. Accordingly, we find that the payments that petitioner received from the companies for sales made by the down-line distributors are gross receipts from petitioner's trade or business.

Issue 2. Whether the Net Profit From Petitioners' Trade or Business Is Subject to Self-Employment Tax

Section 1401 imposes a tax on an individual's net earnings from self-employment. In general, self-employment income consists of the net earnings derived by an individual from a trade or business carried on by him as a sole proprietor, or by a partnership of which he is a member. Sec. 1.1401-1(c), Income Tax Regs. The term "net earnings from self-employment" is defined as the gross income derived by an individual from any trade or business less any allowable deductions attributable to the trade or business. Sec. 1402(a). The term "trade or business", when used with reference to self-employment income or

net earnings from self-employment, has the same meaning as when used in section 162 (relating to trade or business expenses). Sec. 1402(c). The Supreme Court has interpreted the "trade or business" terminology of section 162 as follows: "the taxpayer must be involved in the activity with continuity and regularity and that taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, supra at 35.

At trial, petitioner argued that the payments were like dividends. Dividends on any share of stock are excluded from gross income and deductions in computing net income from self-employment. Sec. 1402(a)(2). The term "dividend" is defined for purposes of subtitle A[6] as any distribution of property made by a corporation to its shareholders out of its earnings and profits accumulated after February 28, 1913, or out of its earnings and profits of the taxable year. Sec. 316(a). Petitioner did not claim to own shares of stock in any of the companies that made payments to him. Nor did he claim that the payments were made on account of anything other than the agreements he had with the companies to pay him a commission on the sales made by his down-line distributors.

---

[6] Secs. 1401 and 1402 are contained in subtit. A of the Internal Revenue Code.

We therefore find that the payments petitioner received from the companies are not dividends excluded from self-employment tax under section 1402.

Petitioner also referred to the payments as royalties. Royalties are defined as payments received for the right to use intangible property rights, and that definition does not include payments for services. Sierra Club, Inc. v. Commissioner, 86 F.3d 1526, 1535 (9th Cir. 1996) (defining royalties for the purposes of section 512(b)), affg. in part and revg. in part 103 T.C. 307 (1994); see also Disabled Am. Veterans v. Commissioner, 94 T.C. 60, 72 (1990) (the regulations define royalties, other than mineral, oil, or gas royalties, for personal holding company purposes, as "amounts received for the privilege of using patents, copyrights, secret processes and formulas, good will, trade marks, trade brands, franchises, and other like property."), revd. 942 F.2d 309 (6th Cir. 1991); sec. 1.543-1(b)(3), Income Tax Regs. Petitioner has not provided any persuasive evidence that the payments he received from the companies were for the right to use his intangible property rights, if any, and not for services.

We do not need to resolve the question of whether the payments petitioner received from the companies are royalty payments to decide this case. Royalty payments, unlike dividends, are not specifically excepted from self-employment tax

by section 1402.  Furthermore, royalty payments received as self-employment income from a trade or business are subject to self-employment tax.  <u>Dacey v. Commissioner</u>, T.C. Memo. 1992-187; <u>Hittleman v. Commissioner</u>, T.C. Memo. 1990-325, affd. without published opinion 945 F.2d 409 (9th Cir. 1991); <u>Langford v. Commissioner</u>, T.C. Memo. 1988-300, affd. without published opinion 881 F.2d 1076 (6th Cir. 1989).

We have found that petitioner is in the trade or business of selling the companies' products and recruiting distributors, and that the payments that petitioner received from the companies for sales made by his down-line distributors, regardless of whether he had personal contact with them, are gross receipts from his trade or business.  Therefore, all such income is self-employment income to petitioner which is subject to self-employment tax under section 1401.

For the foregoing reasons,

<u>Decision will be entered under Rule 155.</u>